IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOREN BURK,<br><br>        Plaintiff,<br><br>  vs.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security<br><br>        Defendant.<br>_____ | CASE No.: 1:09-cv-00350-JLT<br><br>ORDER ON PLAINTIFF'S SOCIAL SECURITY APPEAL<br><br>ORDER REMANDING PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(g)<br><br>ORDER DIRECTING THE CLERK TO ENTER JUDGMENT IN FAVOR OF PLAINTIFF LOREN BURK AND AGAINST DEFENDANT MICHAEL J. ASTRUE<br><br>(Doc. 15) |

**BACKGROUND**

Plaintiff Loren Burk ("Plaintiff") seeks judicial review of an administrative decision denying his claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act (the "Act").

**FACTS AND PRIOR PROCEEDINGS**[1]

On December 7, 2005, Plaintiff filed an application for DIB under Title II of the Act in which he alleged that he suffered from a disability with a claimed onset date of September 27, 2005. AR at 141. Subsequently, Plaintiff filed an application for SSI benefits under Title XVI of

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1

the Act.  Id. at 131-40.   After his applications for benefits were denied by the Agency, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). On September 2, 2008, the ALJ issued a decision denying benefits.  Id. at 6-18.  Specifically, the ALJ found that Plaintiff was not disabled within the meaning of the Act.  Id. at 18.  On December 24, 2008, the Appeals Council affirmed this decision.  Id. at 1-3.

Hearing Testimony

At the hearing held on July 15, 2008, Plaintiff testified that he lived with his wife, 15-year old son and a non-relative renter.  AR at 27.  He stated that his wife did not work, that she attended college full-time, and that the family's source of income was her financial aide.  Id.  He clarified that his wife also received food stamps and "welfare."  Id. at 28. Plaintiff reported that he had completed 13 years of formal schooling and had received training in electronics while he was in the Navy.  Id. at 27.

Plaintiff testified that he had worked previously for Integrated Teleservices.  AR at 29.  He stated that his job involved installing phone lines and computer systems, but that he also performed supervisory/management duties.  Id. at 28-30.  Plaintiff stated he stopped working because he was laid off.  Id.  He stated that he sent out about 100 resumes trying to find a new job but he was not successful.  Id. at 30.  He said that the medications he took for his physical conditions hindered his ability to perform well at interviews because they made him "lose track" of what he was doing.  Id.

Plaintiff recounted numerous physical problems including discomfort in his neck and arm muscles.  AR at 32.  He reported that testing showed he had mild carpal tunnel syndrome (Id. at 35) and that "nerve damage" in his neck caused him to have trouble controlling his hands and caused numbness in his arms.  Id. at 31-32.  Plaintiff stated that the numbness in his extremities was so bad that he could stick a finger in hot oil without feeling anything.  AR at 32.  He described suffering "tremors" in his hands that caused him to drop things.  Id. at 47.  He stated that this problem prevented him from writing with a pen (Id. at 31) and he did not believe he could use his hands to perform repetitive tasks.  Id. at 48.  He stated also that he could not reach over his head.  Id. at 32.

Plaintiff reported also being unable to feel his feet because of the condition of his lower

back. Id. at 32. He stated that his physical conditions hindered his ability to sleep and he estimated that he slept only about four to four-and-a-half hours per night. Id. at 40. Plaintiff maintained that these physical problems started in 2005 or 2006. Id. at 51.

Plaintiff testified that the primary treatment for his physical problems was medication. AR at 31. He described taking numerous medications, including muscle relaxers and anti-inflammatories and strong pain medications like Vicodin and Hydrocodone. Id. Although he described several side affects from the medications, such as poor memory, sexual dysfunction and drowsiness, he believed that taking the medications was necessary, and stated that he couldn't do anything if he didn't take them. Id. at 34. As an example, he maintained that without the medication he could not button his shirt. Id.

Plaintiff described his activities and testified that he could take care of his own grooming and hygiene. AR at 41. However, he stated that because of his physical problems tasks like shaving took "a long time." Id. He estimated that it could take him one hour to shave and 35 minutes to make a grilled cheese sandwich. Id. at 50. He stated that he did no house cleaning or yard work but did rinse the dishes. Id. He indicated that he did not socialize and had no current hobbies, but claimed that before his physical problems began, he built furniture. Id. at 42. Plaintiff testified that he didn't watch much television but he did spend time listening to music. AR at 43. He stated that he used a computer to check e-mail. Id.

Plaintiff estimated that he could lift 40 pounds with discomfort and 20 to 25 pounds comfortably. AR at 43-44. He estimated that he could walk about 10 to 15 minutes at one time before needing to rest. Id. at 44. After resting for approximately seven minutes, he believed he could resume walking. Id. Plaintiff stated that he could stand for about three or four hours at once before needing to sit down for a few minutes. Id. at 44-45. In fact, he stated that standing was the easiest position for him because of his back pain. Id. at 45. Conversely, he believed he could not sit for more than one hour at a time and, then, only if he took his medication. Id.

Plaintiff testified that he might drink ten beers in one day but that he didn't drink every day. AR at 52. He indicated that he drank "light" beer and claimed that it helped him handle the medications he took and helped him to relax. Id. He stated that he never had "issues" with

drinking, such as a DUI.  Id.

Judith Najarian, a vocational expert ("VE") also testified.  She noted that Plaintiff began working at Integrated Teleservices in 1993 or 1994.  AR at 55.  She described several jobs he performed with this company including telephone in-home repair, line installer repair, and working supervisor wherein he supervised customer service.  Id. at 56.  The VE described Plaintiff's work as an installer as skilled and either medium or heavy in terms of exertion level.  AR at 56.  She characterized his supervisory work as light, but noted that he continued to perform some installation work and, thus, this work was still considered medium or heavy.  Id.

The ALJ posed several hypotheticals to the VE.  In the first, he described a person of Plaintiff's age, education and work experience who could lift 50 pounds occasionally and 20 pounds frequently, but was limited to simple one, two and three-step job tasks "as a consequence of the affect of medication."  AR at 58-59.  In addition, he indicated that the person could only occasionally grasp, handle, twist, turn and feel with the upper extremities.  Id. at 59.  The VE opined that under this scenario, such a person could not perform Plaintiff's past work, but could perform other "light" work such as usher, furniture counter clerk, and protective clothing issuer.  AR at 59-60.

In his second hypothetical, the ALJ described the same individual as in the first hypothetical, but restricted the person to lifting 40 pounds occasionally and 25 pounds frequently.  AR at 60.  The ALJ restricted the person to walking 10 to 15 minutes at one time, standing three to four hours at once, with a brief change of position (five to six minutes) before resuming standing, and sitting one hour at a time with a maximum sitting time of two to three hours during an entire workday.  Id. at 60-61.  The ALJ placed no manipulative restrictions on the person.  Id. at 61.  The VE opined that this person could not perform Plaintiff's past work, but could perform "line jobs" such as poultry cutter and production line solderer.  AR at 61.  However, the VE conditioned her opinion on the individual being able to perform "repetitive" hand-work without any limitation.  Id. at 62-63.

In a third hypothetical, the ALJ described a person who was able to lift 40 pounds occasionally and 25 pounds frequently; whose ability to stand was "substantially intact," who had

the ability to sit but had only a limited ability to walk. AR at 63. The VE stated that such a person could perform the "line jobs" previously mentioned and perhaps work as a cashier. AR at 63-64. However, she believed that if such a person were limited to occasional gross and fine handling, this work would be precluded. Id. at 64.

In a fourth hypothetical, the ALJ described a person who could lift 20 pounds occasionally, 10 pounds frequently, stand at least six hours in an eight-hour day with normal breaks, sit two hours in an eight-hour workday, and use his hands for fine manipulation and gross handling only occasionally. AR at 68. The VE opined that such a person could still not perform Plaintiff's past work. AR at 68. However, the VE stated that the restrictions presented in this hypothetical would not preclude work as a sales representative in telephone sales. See id. at 69-70.

Finally, Plaintiff's counsel asked the VE if such a person could work if further limited to taking five or six times longer than normal to perform simple non-exertional tasks. AR at 72. The VE responded that such a person would be unemployable. Id.

Relevant Medical Evidence

An MRI performed on Plaintiff in September 2005, indicated a broad disc bulge at C5-6 that compromised the spinal canal with "moderate spinal canal stenosis." AR at 260. The radiologist noted multiple degenerative disc changes and characterized the condition as abnormal. Id. at 261.

An MRI taken in April 2006, re-confirmed "mild-moderate" multiple degenerative disc disease "throughout the cervical spine." AR at 560. While the radiologist described "moderate disc osteophyte complex" and "moderate bilateral degenerative facet disease," he found no central canal or neural foraminal stenosis as noted in the prior MRI. Id. at 561. He characterized the condition as a "mild abnormality." Id.

Also in April 2006, a radiologist interpreted x-rays of Plaintiff's cervical spine as displaying "minimal anterior osteophyte formation but no signs of compression." AR at 566. The radiologist described "minimal spondylosis" and muscle spasm. Id. X-rays of the thoracic spine revealed "no visible compression fractures" with "very shallow levoscoliosis and "scoliotic curvature." Id. at 567.

1        Beginning in 2004, Plaintiff was treated by Dr. Gurchuran Gill with the Veterans
2 Administration ("VA") in Fresno. Progress notes from regular examinations indicate that Plaintiff
3 was seen by Dr. Gill approximately every three months through April 2008, for "chronic"
4 problems, including complaints of severe neck and low back pain, and numbness in his arms and
5 feet. See AR at 272-74, 282-84, 288-92, 297-99, 307-08, 330, 469-71, 548-550, 605-08, 611-14,
6 617-18, 622-24, 627-30, 634-36, 639-42. Dr. Gill repeatedly diagnosed Plaintiff with several
7 conditions, including myoclonus (noting episodic myoclonic activity in Plaintiff's legs and arms),
8 cervical spondylosis without myelopathy, low back pain and peripheral neuropathy. See id. Dr.
9 Gill consistently recorded that Plaintiff raised complaints of severe neck and low back pain, and
10 numbness in his arms and feet. See id.

11        In February 2007, Dr. Gill filled out a report for the VA reiterating his diagnoses, including
12 cervical spondylosis without myelopathy, neuropathy and back pain. AR at 552. In addition, Dr.
13 Gill reported that Plaintiff's symptoms were chronic pain and numbness. Id. Specifically, Dr. Gill
14 stated that Plaintiff had "chronic severe incapacitating pain in [the] neck and upper extremities and
15 pain [in the] lower extremities as well." Id. at 553. Dr. Gill opined that these impairments
16 rendered Plaintiff permanently and totally disabled and precluded him from performing any work.
17 Id.

18        In February 2006, Plaintiff was examined by Dr. Sarupinder Bhangoo, a specialist in
19 internal medicine. He reviewed Plaintiff's medical records and noted Plaintiff's complaint of neck
20 and low back pain. AR at 224. He noted also that Plaintiff was taking numerous medications to
21 treat his complaints. Id. at 225.

22        During his physical examination, Dr. Bhangoo observed that Plaintiff moved well, with no
23 apparent pain, and that he was capable of getting into and out of a chair and on a table without
24 problem. AR at 225. He observed that Plaintiff could bend over and tie and untie his shoes. Id.
25 Dr. Bhangoo described Plaintiff's neck as "supple," his lungs as "clear," and noted a normal cardio
26 and pulse rate. AR at 226. His sensory examination found Plaintiff's reaction to pinprick and
27 touch to be normal and that Plaintiff's reflexes were normal. Id. Dr. Bhangoo determined that
28 Plaintiff had normal motor strength. Id. at 227.

1     Dr. Bhangoo diagnosed Plaintiff with general cervical and lumbosacral sprains. AR at 227.
2 He noted that Plaintiff had not worked since an injury he sustained in July 2005, but also noted that
3 Plaintiff told him he stopped working because he was laid off. Id. He stated that Plaintiff could
4 attend to his own personal care and do house work. Id. Dr. Bhangoo believed that the fact that
5 Plaintiff was "looking for a job suggests [he] is quite active and capable of full time work." Id.

6     Based on his examination and findings, Dr. Bhangoo opined that Plaintiff could stand
7 and/or walk for eight hours in an eight-hour workday and sit for eight hours in the same workday.
8 AR at 227. He opined that Plaintiff could lift and carry 100 pounds occasionally and 50 pounds
9 frequently, with no postural or manipulative limitations. Id. at 227-28. He stated that "[d]espite
10 the claimant's history of neck and back pain, he does not have any neurological or musculoskeletal
11 limitations on examination" and characterized his "maximal functional capability . . . as heavy with
12 no limitations." Id. at 228.

13     In April 2006, Plaintiff was examined by a neurosurgeon, Stephen Skirboll . Based on his
14 examination, Dr. Skirboll described Plaintiff as "awake and alert, appropriate, fluent." Id. at 558.
15 Despite Plaintiff's descriptions of his cervical pain and pain and numbness in his upper extremities
16 (AR at 557), Dr. Skirboll noted that Plaintiff had minimal pain with palpation in the lumbar spine,
17 full motor strength, a "narrow" and "non-spastic" gait with "no tinnels sign" but "partial Phalens
18 sign." Id. Dr. Skirboll also reviewed the MRIs and x-rays. In his opinion, the MRI indicated a
19 "small, thin probable syrinx in [the] lower cervical cord" but he found no significant stenosis. AR
20 at 558. He noted that Plaintiff had "progressive" pain and numbness in his upper extremities "with
21 relation to head position." Id. He recommended further testing. See id.

22     In June 2006, Dr. M.O. Nawar, a non-examining Agency consultant, filled out a Physical
23 Residual Functional Capacity ("RFC") form. Based upon his assessment of the medical records,
24 he opined that Plaintiff could lift and/or carry 50 pounds occasionally and 25 pounds frequently
25 and he could stand/walk and sit for six hours in an eight-hour day, with no postural or manipulative
26 limitations. AR at 230-31. Based upon the results of the MRIsthat indicated that Plaintiff had
27 degenerative changes at multiple levels in his spine, Dr. Nawar disagreed with Dr. Bhangoo's
28 finding that Plaintiff could sustain a "heavy" RFC but believed that Plaintiff could perform work

7

1  that required a medium level of exertion.  Id. at 233.

2  In April 2007, Plaintiff was examined by another neurologist, Dr. Abbas Mehdi.  Dr. Mehdi
3  recorded Plaintiff's chief complaints as bilateral hand numbness and neck pain.  AR at 569.  He
4  recorded Plaintiff's descriptions of his conditions that included "constant" neck pain that radiated
5  to his upper extremities and "shaking" in both hands.  Id.  Dr. Mehdi noted the extensive treatment
6  records from the VA for these symptoms which included numerous prescription medications.  Id.

7  Upon examination, Dr. Mehdi noted a "mildly" reduced range of motion in Plaintiff's neck,
8  but found that Plaintiff had a full range of motion in his back and upper extremities.  AR at 570.
9  He noted that Plaintiff had full motor strength and normal sensory feeling and had a normal gait.
10 Id. at 571.  Dr. Mehdi found that Plaintiff had a small syrinx in his neck but believed that he was
11 capable of carrying and lifting 50 pounds occasionally and 20 pounds frequently, that he could
12 stand/walk for six hours in an eight-hour day and that he could sit without limitation.  AR at 571.
13 He opined that Plaintiff had "no exertional limitations."  Id.

14 ALJ Findings

15 The ALJ evaluated Plaintiff pursuant to the customary five-step sequential evaluation.  The
16 ALJ determined first that Plaintiff had not engaged in substantial gainful activity since the claimed
17 onset of his disability on September 27, 2005.  AR at 11.  Second, he found that Plaintiff had a
18 severe impairment caused by cervical disc disease.  Id.  Third, the ALJ determined that Plaintiff did
19 not have an impairment, or a combination of impairments, that met or exceeded the level required
20 under Agency guidelines for presumed disability.  Id.

21 Fourth, the ALJ determined that Plaintiff had the RFC to lift and carry 50 pounds
22 occasionally and 25 pounds frequently and to occasionally grasp, handle, twist, turn and feel with
23 his upper extremities but due to the side effects from his medications, Plaintiff was limited to
24 performing jobs that required only simple, one, two or three-step instructions.  AR at 12.  Based
25 thereon, the ALJ found that Plaintiff could not perform his past relevant work but, based on his
26 RFC assessment and the testimony of the VE, the ALJ concluded that Plaintiff retained the ability
27 to perform other work in the national economy (Step 5).  Id. at 16-17.  As a result, the ALJ
28 determined that Plaintiff was not disabled as defined by the Act.  Id. at 17.

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. When reviewing the findings of fact, the Court must determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. 405 (g).

Substantial evidence means "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). The Court must uphold the determination that the claimant is not disabled if the Commissioner applied the proper legal standards and if the findings are supported by substantial evidence. *See* Sanchez v. Sec'y of Health and Human Serv., 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. Quang Van Han v. Bowen, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which includes the five-step sequential disability evaluation process described above. 20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).[2] As noted, applying this process in this case,

---

[2] All references are to the 2000 version of the Code of Federal Regulations unless otherwise noted.

the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of his disability; (2) had a medically determinable severe impairment (cervical disc disease ); (3) did not have an impairment which met or equaled one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) could not perform his past relevant work; but (5) retained the RFC to perform other work related activities. AR at 11-17. The ALJ then determined that Plaintiff was not under a "disability" as defined in the Act. Id. at 17.

Plaintiff challenges the ALJ's determination at Step 5 of the sequential evaluation process, where his ability to perform work other than his past relevant workwas assessed based upon his RFC. In particular, Plaintiff challenges the ALJ's failure to consider third party lay evidence, his rejection of the treating physician's opinion, and his rejection of Plaintiff's symptom testimony. (See Doc. 15 at 7-13).

## DISCUSSION

1. The ALJ's failure to address the third-party lay evidence was error

Plaintiff contends that the ALJ erred by failing to address the third party evidence in the record. In particular, he contends that the ALJ failed to mention, let alone evaluate, a statement from Plaintiff's wife, Kimberly Burk, and a letter from a friend, Kelly Chapman, which he asserts "evidences significantly greater limitations [than] those found by the ALJ." (Doc. 15 at 7-8).

Plaintiff refers to the February 2007 questionnaire completed by Ms. Burk for the Social Security Administration. In the questionnaire, Ms. Burk described Plaintiff's ability to perform daily activities such as attending to his personal care, preparing meals, doing house and yard work, shopping and performing other activities. AR at 181-88. Plaintiff highlights excerpts from the questionnaire in which his wife described his difficulty with buttoning his pants and shirts, showering, shaving, preparing meals, holding and carrying drinks and food, writing checks, concentrating, and his inability to "lift, squat, bend, kneel, reach or sit in certain positions due to pain and numbness." Doc. 15 at 8; see also AR at 182-87.

Plaintiff relies also on a June 2008 letter written by Kelly Chapman to the VA. AR at 222-23. In her letter, Ms. Chapman wrote that she was with Plaintiff in June 2005, when he fell and injured his neck and back while attempting to unload a box from a U-haul truck. Id. at 223. She

10

reported that after this incident, she witnessed Plaintiff's physical condition worsen steadily due to "nerve damage" he sustained during the fall.  Id.  She stated that "he now has to rely on others to complete even the smallest of tasks" and is not "the same person with the skills that he had to install computer networks and telephone systems."  Id. Plaintiff contends that this lay witness evidence supports his own subjective pain complaints and argues that the ALJ's failure to consider it is contrary to the regulations and case law.

Review of the record indicates that the ALJ failed to acknowledge, let alone discuss, the statements made by Ms. Burk in her questionnaire or by Ms. Chapman in her letter. Defendant does not dispute this but argues that any failure was harmless because the ALJ considered and accounted for many of the restrictions referred to by Ms. Burk and Ms. Chapman in his decision. (See Doc. 16 at 14-15).  This argument amounts to nothing more than an assertion that if the ALJ wanted to, he could have found reasons for discounting this evidence.  The problem is, however, that the ALJ failed to make any findings regarding this evidence whatsoever.  See Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003) (holding that the presence of evidence in the record that would support an ALJ's conclusion, in the absence of the ALJ's discussion thereof, is insufficient).  In Stout v. Commissioner, 454 F.3d 1050, 1053 (9th Cir. 2006), the Court rejected a similar argument when it considered whether the ALJ's "silent disregard of the lay testimony" was harmless error.  The Court observed,

> In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work. See Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e). Indeed, "lay testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence . . . and therefore cannot be disregarded without comment." Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996) (citations omitted). Consequently, "[i]f the ALJ wishes to discount the testimony of lay witnesses, he must give reasons that are germane to each witness." Dodrill, 12 F.3d at 919; see also Lewis v. Apfel, 236 F.3d 503, 511 ("Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." (citations omitted)).

Id.  Thus, the Court held that the district court was not permitted to conduct a harmless error

analysis as to lay evidence[3] where the ALJ failed to comment on the evidence because "the ALJ, not the district court, is required to provide specific reasons for rejected lay testimony." Id. at 1054.

The evidence from Ms. Burk and Ms. Chapman is directly relevant to the determination of the severity of Plaintiff's impairments and their effect on his ability to work. Also, it relates to the determination regarding the validity of Plaintiff's subjective complaints. The Court cannot say with certainty that no reasonable ALJ, when considering this evidence, would have reached the same disability determination as made here. Stout, 454 F.3d at 1056 (holding that "where the ALJ's error lies in a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination"). Because the district court cannot review evidentiary findings that the ALJ failed to make, and because the *complete* failure to address such evidence is not harmless error, remand is appropriate. Stout, 454 F.3d at 1056.

2. <u>The ALJ's failure to explain his rejection of Dr. Gill's opinion without providing specific and legitimate reasons warrants remand</u>

Plaintiff contends that the ALJ erred in rejecting the opinion of his treating physician, Dr. Gill, without providing a sufficient basis for doing so. (Doc. 15 at 13).

As noted, in February 2007, Dr. Gill diagnosed Plaintiff with cervical spondylosis, peripheral neuropathy and low back pain. See AR at 13-14, 552-53. Dr. Gill opined that these impairments rendered Plaintiff permanently disabled and unable to work because of "chronic,

---

[3] The Court notes that although Ms. Burk's evidence was presented via a questionnaire and Ms. Chapman's was contained in a letter, this requirement applies to written statements. Dodrill, 12 F.3d 915, 919 (9th Cir. 1993)(applying this standard to written as well as testimonial evidence). In addition, various regulations support the view that unsworn documents, in the nature of letters and daily activities questionnaires, should be considered for the purpose of establishing the severity of impairments and determining the RFC. 20 C.F.R. § 1513(d)(4) (providing that "[i]n addition to evidence from the acceptable medical sources listed in paragraph (a) of this section, we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work. Other sources include . . . . non-medical sources (for example, spouses, parents and other caregivers . . ."); 20 C.F.R. § 404.1512(a)(3); § 416.912(b)(3) (defining evidence as "anything [the claimant] or anyone else submits to us or that we obtain . . . which includes . . . . Statements you or others make about your impairment(s), your restrictions, your daily activities, your efforts to work, or any other relevant statements you make to medical sources during the course of examination or treatment, or to use during interviews, on applications, in letters, and in testimony in our administrative proceedings . . .")

severe incapacitating pain in the neck and upper extremities as well as the lower extremities." Id. at 14, 553. Nevertheless, the ALJ gave Dr. Gill's opinion "no weight" because he believed that the ultimate issue of disability was reserved for the Commissioner and because he believed that Dr. Gill's opinion "is not supported by the totality of the medical evidence of record, i.e., there are no medical records or formal testing performed to support his conclusions." Id. at 15. The ALJ provided no further elaboration for rejecting Dr. Gill's opinion.

The opinions and conclusions of a treating physician are entitled to significant weight and, if contradicted by evidence from other sources, may be discounted by the ALJ only if he outlines specific and legitimate reasons for doing so based upon substantial evidence in the record. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995); Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989). This burden can be met "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Magallanes, 881 F.2d at 751. In sum, "[t]he ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." Embrey v. Bowen, 849 F.2d 418,421-22 (9th Cir. 1988).

Although the ALJ cited other evidence, including the opinions of two examining consultants, to support his RFC finding and conclusion that Plaintiff retained the ability to perform other work in the state and national economy, he failed to outline why he felt that this conflict in the evidence justified rejecting the treating physician's opinion. While it is true that the determination of disability is ultimately the Commissioner's, objective evidence in the record, beyond Plaintiff's symptom complaints, was available to Dr. Gill to support his opinion that pain from Plaintiff's disc disease prevented him from working. For instance, x-rays and two MRI's confirmed some degree of cervical disc disease and progress notes by Dr. Gill indicated that he considered these tests when he diagnosed Plaintiff. See AR at 548.

In addition, Dr. Gill saw Plaintiff on a frequent basis; approximately every three months over a four year period leading up to the administrative hearing. Magallanes, 881 F.2d at 751 (noting that the court "accord[s] greater weight to a treating physician's opinion because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.")

The record indicates that Dr. Gill reviewed the results of at least one MRI to formulate his diagnoses. Id. at 548. He maintained this diagnosis throughout his four-year treatment of Plaintiff. Over the years, Dr. Gill recorded his observations and impressions of Plaintiff's neck pain, low back pain and numbness and often characterized the pain as "severe." See AR at 282, 297, 307, 330, 548, 552-53, 605, 639. In addition, his progress notes document that he consistently prescribed an unusually large regimen of medications to treat Plaintiff's impairments, including several medications for pain such as Vicodin and medications to treat Plaintiff's hand tremors and the pain associated therewith such as Baclofen, Carbidopa and Gabapentin. Thus, the Court disagrees that there is no objective medical evidence supporting Dr. Gill's opinion.

The Court notes that Dr. Gill's progress notes are formulaic and often fail to outline specific clinical evidence to support his diagnoses and findings. Ultimately, this may provide a basis for rejecting his opinion. Magallanes, 881 F.2d at 751 (noting that a brief, conclusory opinion which lacks the support of clinical findings is a legitimate reason to reject a treating physician's conclusion). However, the ALJ offered only the briefest assertion that Dr. Gill's opinion was unsupported by the "totality of the medical evidence" without any analysis and, plainly, without considering the entirety of the information before Dr. Gill. This is not sufficient. Embrey, 849 F.2d at 421-22; Magallanes, 881 F.2d at 751.

Defendant attempts to identify specific grounds for rejecting Dr. Gill's opinion, noting that "the statement lacks the type of detailed information about Plaintiff's ability to perform specific job-related activities that is necessary for the RFC assessment." (Doc. 16 at 10-11). He argues also that the opinions of the non-treating examiners, in particular that of Dr. Mehdi (a board certified neurologist), were properly accorded greater weight by the ALJ. (Id. at 11). However, although specific and legitimate reasons for rejecting Dr. Gill's opinion may exist in the record, the ALJ failed to identify or discuss *his* reasons for rejecting Dr. Gill's opinion.

Moreover, in light of his finding at Step 2, that Plaintiff's cervical disc disease was "severe," and his determination that this impairment could reasonably be expected to produce some

of Plaintiff's alleged symptoms,[4] the ALJ's cursory rejection of Dr. Gill's opinion was insufficient. At a minimum, if the ALJ believed Dr. Gill's opinion was "not supported by the medical record," he should have cited specific evidence, such as the opinions of other doctors he believed were in conflict, and explained why this other evidence was superior. He failed to do this and this failure requires remand.

Plaintiff argues that if the ALJ believed Dr. Gill's opinion was "inconsistent with his records," he should have attempted to contact Dr. Gill for further explanation. (Doc. 15 at 13). Because the Court concludes that the ALJ committed error for the reasons just discussed, the Court need not address whether the ALJ should have contacted Dr. Gill for further clarification. Upon remand the ALJ may consider whether supplementation of the record is warranted. See 20 C.F.R. §§ 404.1512(e) and 416.912(e); Mayes v. Massanari, 262 F.3d 963, 968 (9th Cir. 2001) (noting the ALJ's duty to supplement the record if evidence is ambiguous and/or incomplete).

    3. It is premature to evaluate the ALJ's decision to discount Plaintiff's symptom testimony

Plaintiff challenges the ALJ's determination that his symptom testimony was not credible. (Doc. 15 at 10-12); see AR at 14. In light of the Court's determination that this matter must be remanded because the ALJ failed to address the lay witness evidence relevant to the severity of Plaintiff symptoms and failed to support his decision to reject Dr. Gill's opinion, there is no need to address this issue at this time. On remand, the ALJ's determinations as to these other matters may impact his determination that Plaintiff's symptom testimony is lacking in credibility.

    4. Remand is appropriate in this case

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the district court. Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir. 2000). When a court reverses an administrative agency determination, the proper course, except in rare instances, is to remand to the agency for additional

---

[4] The ALJ discounted Plaintiff's symptom testimony and concluded that "the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons stated below." AR at 14.

investigation or explanation. <u>Moisa v. Barnhart</u>, 367 F.3d 882, 886 (9th Cir. 2004) (citing <u>INS v. Ventura</u>, 537 U.S. 12, 16 (2002)).  Generally, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record has been fully developed. <u>Varney v. Secretary of Health and Human Services</u>, 859 F.2d 1396, 1399 (9th Cir. 1988).

Because additional issues remain to be addressed upon remand and because it is not clear that an award of benefits should result after the additional issues are addressed, the Court will order the matter remanded. <u>McAllister v. Sullivan</u>, 888 F.2d 599, 603 (9th Cir. 1989) (the decision to remand for further proceedings or simply to award benefits is within the discretion of the court).

**CONCLUSION**

Based on the foregoing, this matter is HEREBY REMANDED for further proceedings consistent with this decision.  The Clerk of Court IS DIRECTED to enter judgment in favor of Plaintiff.

IT IS SO ORDERED.

Dated:   **July 1, 2010**                                      **/s/ Jennifer L. Thurston**
                                                                                UNITED STATES MAGISTRATE JUDGE